AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
SEP 2 6 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>One LG B470<br>IMEI: 014858001265615 | Case No.<br>**'19MJ10884** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(ii) & (v)(I) | Conspiracy to Transport Aliens in the United States |
| 8 USC 1325(a)(1) & 18 USC 2 | Improper Entry and Aiding and Abetting |

The application is based on these facts:

See attached affidavit of Border Patrol Agent Miguel Flores

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Miguel Flores, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/26/19

_____
Judge's signature

City and state: El Centro, California    Hon. Ruth Bermudez Montenegro, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-3

PROPERTY TO BE SEARCHED

**Target Phone 3**

    One LG B470
    IMEI: 014858001265615

Currently in the possession of Indio Border Patrol Station located at 45620 Commerce Street, Indio, California 92201.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search **Target Phones 1 through 4** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Phones 1 through 4** for evidence described below. The seizure and search of **Target Phones 1 through 4**, and will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from **Target Phones 1 through 4** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period from June 1, 2019 (approximately a week before one of the material witnesses began their journey from Mexico to the United States) through August 1, 2019 (the date after the apprehension).

a. tending to identify the smuggling of undocumented aliens into the United States and then to the final destination within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

d. tending to identify travel to or presence at locations such as stash houses, ports of call, launch bays, or delivery points involved in the smuggling of undocumented aliens into the United States, or to their final destination within the United States;

e. tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above; and

    g.    tending to identify method, and manner of payment for smuggling of undocumented aliens into the United States, or to their final destination within the United States;

    h.    tending to support or contradict the statements provided by Erica Ortis, Juan Garcia-Sanchez, Juan Aguillares-Delgado, Ramiro Gonzalez-Madrigal, and Brigido Jose Villa-Mota.

which are evidence of crimes and property used in the commission of crimes of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States Code, Section 2 -- Improper Entry and Aiding and Abetting.



# AFFIDAVIT

I, Miguel Flores, U.S. Border Patrol Agent, after being duly sworn, state:

## INTRODUCTION

1. I make this affidavit in support of applications for warrants for four (4) cellular phones seized from a July 31, 2019 human smuggling event. These cellular phones are described as follows:

    a. One Apple iPhone 7 A1660
       FCC ID: BCG-E3085A
       ("Target Phone 1")

    b. One Alcatel Cricket
       IMEI: 014858001265615
       ("Target Phone 2")

    c. One LG B470
       IMEI: 014858001265615
       ("Target Phone 3")

    d. One Samsung Galaxy S10+
       IMEI: 358181101169080
       ("Target Phone 4")

further described in Attachments A-1 through A-4, respectively, and incorporated herein by reference. These devices currently are in the possession of Indio Border Patrol Station located at 45620 Commerce Street, Indio, California 92201.

2. I seek authority to search the **Target Phones 1 through 4** for evidence of crimes and property used in the commission of crimes, described more fully in Attachment B (incorporated herein by reference), for violations of: Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States Code, Section 2 -- Improper Entry and Aiding and Abetting. I seek authority to search **Target Phones 1 through 4** from June 1, 2019 (approximately a week before one of the material

witnesses began their journey from Mexico to the United States) through August 1, 2019 (the date after the apprehension).

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the applications for search warrants, it does not set forth every fact that others or I have learned during the course of this investigation. Dates, times and amounts are approximate.

**EXPERIENCE AND TRAINING**

4. I am a Border Patrol Agent employed by the U.S. Department of Homeland Security ("DHS"), Customs and Border Protection. I have been a Border Patrol Agent since December 4, 2006. I am a graduate of the USBP Training Academy in Artesia, New Mexico. I am a graduate of the Federal Law Enforcement Training Center ("FLETC").

5. I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. I am empowered to conduct investigations of, and to make arrests for, federal offenses.

6. As a Border Patrol Agent, my primary duties include the investigation of criminal immigration-related violations under Title 8 of the United States Code. I investigate violations of the United States Code, including alien smuggling or human trafficking and illegal entries within the Southern District of California. I have spoken with other agents with extensive experience in human smuggling investigations.

7. I have arrested or participated in the arrest of numerous persons for violations under Title 8 of the U.S. Code. In these cases, I have conducted interviews with the arrested persons and their associates, as well as cooperating individuals and informants. I have conducted surveillance of human smugglers while operating inside the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of human smuggling organizations, and the structure of their networks. I also have gained information as to the normal operational habits of persons who make

their living as human smugglers.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, defendants, and smuggled humans, I am aware that it is a common practice for: (a) human smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and portable radios to maintain communications with co-conspirators in order to further their criminal activities; and, (b) the smuggled aliens to communicate with the human smugglers or a go-between by utilizing cellular telephones in order to further their illegal entry into the United States. Conspiracies involved in the smuggling and trafficking of undocumented aliens generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the method and manner of the smuggling venture, arrangements of travel and payment, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators. I also know that human smugglers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of human smuggling investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10. Based upon my training and experience and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Human smugglers and smuggled aliens use "digital devices," including cellular telephones and smart electronic devices with messaging applications because these devices are mobile. In addition, these devices allow smugglers and smuggled aliens to

have instant access to telephone calls, instant messaging, text messaging, social media applications, and voice messaging.

      b.    Human smugglers and smuggled aliens use their cellular telephones and smart electronic devices to communicate amongst each other to coordinate the logistics and payments related to the smuggling of the undocumented aliens into the United States and from thereon.

      c.    An undocumented alien or someone closely associated with this undocumented alien may make contact using their cellular phones or smart electronic devices with an initial human smuggler while the undocumented alien is outside of the United States. They will discuss over the phone or via a messaging application about the logistics as to how to smuggle this undocumented alien into the United States and the financial payments involved with the smuggling act. Using the phone or a messaging application on the phone, this smuggler will work with other associates to coordinate how to smuggle this undocumented alien along with the financial payments. Using the phone itself or a messaging application on their phone, the smuggler or associates will advise the undocumented alien or the close contact to the undocumented alien about the next steps including the meet-up point. Using the phone or messaging application, they may discuss the method, manner and payment at that time or after successfully smuggling the undocumented alien into the United States.

      d.    The undocumented aliens also will use their phones to make calls or send text messages to discuss the smuggling arrangements with the smugglers themselves, or a go-between such as a family member or close friend prior to and during the smuggling event. On making their illegal entry into the United States, the smuggled aliens may use their phones to continue to communicate with the smugglers or the go-between such as a family member or close friend to discuss the manner and method of the smuggling activity including the payment.

      e.    Human smugglers use digital devices to actively monitor the progress of their illegal cargo, i.e., the undocumented aliens, while the conveyance is in transit;

4

  f. Human smugglers and their co-conspirators use cellular/mobile telephones and smart devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations both in Mexico and in the United States;

  g. Human smugglers use digital devices to direct the human smuggler pilots of boats and drivers of cars to synchronize an exact drop off or pick up time of their illegal cargo;

  h. Human smugglers use digital devices to notify or warn their co-conspirators of law enforcement activity, and in particular Custom and Border Protection (CBP) enforcement activity, to include the presence and posture of marked and unmarked units, as well as the operational status of law enforcement checkpoints.

  i. Human smugglers use digital devices to coordinate with stash house operators regarding the logistics of housing the people they are smuggling, such as the time the smuggled people will be dropped off or picked up, a description of the vehicle transporting the smuggled undocumented aliens, the number of persons in transit, the anticipated duration of their stay, and how much and when the stash house operator will be paid.

  j. Human smugglers often keep the names, addresses, and telephone numbers of their associates on their digital devices. Human smugglers often keep records of meetings with associates on their digital devices, including in the form of calendar entries and location data, such as GPS information, other locational information, and identifying information about the smuggler and co-conspirators and the location of previous human smuggling transactions or stash houses, and/or the identity or whereabouts of smugglers and co-conspirators involved in human smuggling.

  k. Subscriber Identity Module (SIM) cards also known as subscriber identity modules are smart cards that store data for certain cellular telephone subscribers. Such data includes user identity, phone number, network authorization data, personal security keys, contact lists, and stored text messages. Dependent on the cellular device, information on a SIM cards can be collected as evidence as to the operator use of

5

that particular cellular telephone. SIM cards may be transferrable between different cellular/mobile telephones. Human smugglers and their co-conspirators sometimes will replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid detection.

11. Based upon my training and experience, consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones and SIM cards may and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones.

**FACTS AS TO THE ALIEN SMUGGLING EVENT**

12. According to a report prepared by Supervisory Border Patrol Agent John Saracco, on July 31, 2019, Agent Saracco was patrolling the S2 Highway north of Ocotillo, California. He previously had responded to that area to assist other Agents with an alien smuggling event. At approximately 4 p.m., he was contacted via Service radio that there were two vehicles traveling north on S2 in tandem. The two vehicles were a 2015 gray Volkswagon Jetta bearing California license plate 8JNT682 (the Jetta) and a silver Honda Accord bearing California license plate 7XJF873 (the Accord). The Jetta had an alert for alien smuggling.

13. Approximately 20 minutes after receiving the Service call, Agent Saracco observed the two vehicles pass by his location. Agent Saracco was in a marked Border Patrol vehicle but was near mile marker 32, off of the road and concealed behind some brush. He noticed the Jetta and Accord were traveling unusually close together. He noticed the Jetta was in front of the Accord.

14. Agent Saracco followed both vehicles for approximately 10 miles. During that time, he noticed the vehicles maintained a distance of approximately 100 feet without

a variance. Given the vehicles were traveling in tandem, the Jetta had an alert for alien smuggling, and Agent Saracco already was involved in an alien smuggling event earlier in the day on the S2 Highway, Agent Saracco was suspicious that the Jetta and Accord were involved in another smuggling event.

15. After following both the Jetta and Honda for approximately 10 miles from a distance, Agent Saracco decided to close the gap and run the plate for the Accord. The plate for the Accord was registered out of Compton, California. Agent Saracco noted that Compton, California was out of the area and also that, in recent months, Border Patrol had been seeing vehicles associated with alien smuggling registered out of Compton, California in his area of operation. And so, Agent Saracco became even more suspicious that the Jetta and Accord were involved in a smuggling event.

16. Agent Saracco performed a vehicle stop on the Accord. The driver of the Accord yielded. As Agent Saracco approached the Accord, he noticed four individuals inside it. He identified himself as a Border Patrol Agent and questioned all four individuals. The driver, later identified as Erika Ortis (Orits), stated that she was a U.S. citizen. The other three occupants – all males – just stared at Agent Saracco blankly. Agent Saracco asked them about their citizenship again and they did not answer. Agent Saracco assumed they were here illegally and then placed them under arrest. These individuals later were identified as Juan Aguillares-Delgado (Aguillares), Ramiro Gonzalez-Madrigal (Gonzalez), and Brigido Jose Villa-Mota (Villa).

17. According to a report prepared by Border Patrol Agent Philip Smith, Agent Smith performed a vehicle stop on the Jetta. The driver of the Jetta yielded. When Agent Smith approached the car, he identified himself as a Border Patrol Agent to the driver, later identified as Juan Garcia-Sanchez (Garcia). Agent Smith questioned Garcia about his citizenship. Garcia responded that he was a lawful permanent resident (LPR) and presented his LPR card. Agent Smith then was informed that the occupants in the Jetta were being arrested for a smuggling event. He then arrested Garcia for the smuggling event.

18. The occupants in the Jetta and Accord were transported to the Border Patrol Station at the 86 Checkpoint for further processing. During processing, Agents identified the following items – **Target Phones 1 through 3** from Garcia, and **Target Phone 4** from Ortis, as well as phones from Aguillares, Gonzalez, and Villa. On or about July 31, 2019, each individual signed a Property Inventory Form acknowledging their respective cell phones as their property.

**Erica Ortis:**

19. As to Ortis, she was interviewed by Border Patrol Agents Tidd and Sandoval. She was read her constitutional rights per *Miranda*, stated she understood those rights, and agreed to speak with the Agents. Ortis stated that she worked as a house cleaner and sold various items at swap meets in Mexico. She claimed that, while attending a swap meet three weeks ago, she spoke with a man she identified as "Refugio." She claimed that Refugio frequently attended the swap meets but that he did not sell anything. She said that Refugio offered her a job to transport illegal aliens from the border to Los Angeles. Ortis said that she initially declined. Ortis then stated that, last week, she again was selling items at the swap meet. She spoke with Refugio again and he offered her the smuggling job. Ortis claimed she needed the extra monies to help with her sick mother's medical bills and so she accepted the job. On the morning of July 30, 2019, she left her home and drove to Tijuana, Mexico to find out the details of the job. Refugio told her that she would be picking up four illegal aliens outside of Ocotillo, California and driving them to downtown Los Angeles, California near an area that sells pinatas. On completion, she would receive $6,000.

20. Ortis stated that, at 2:00 p.m. on July 31, 2019, she arrived in Ocotillo. She began to slowly drive through the area where she was told the illegal aliens were going to be. As she exited Ocotillo, she saw three individuals exit bushes and wave her down. She said that she knew these individuals were the people she was supposed to pick up. Once all three individuals were in the car, she proceeded to drive north on S2 until she was stopped.

8

21. When asked about the Jetta traveling in tandem with her, Ortis initially said that she had no involvement with the driver of the Jetta. The Agents then concluded the interview. However, after Agent Tidd started to escort Ortis from the interview room, Ortis told him that she did "know the other car." She then was brought back into the interview room and re-advised of her constitutional rights per *Miranda*. Ortis then said that she knew the driver of the Jetta, whom she identified as Garcia. She said that Garcia was the ex-boyfriend of her daughter. Ortis said that she asked Garcia to guide her on the trip. She said that they were going to go in one car but they ended up taking two cars when Ortis learned the smuggling event would involve four aliens. Ortis claimed that Garcia was traveling in front of her the whole trip. She said that they were in constant communication over their phones during this trip. Ortis said that she had not discussed what she would pay Garcia but that she would give him money once they finished with the smuggling event. Ortis claimed that Garcia knew that she was transporting illegal aliens and that he was acting as a scout to help her with the smuggling event.

**Juan Garcia-Sanchez:**

22. As to Garcia, he was interviewed by Border Patrol Agents Raymond Herrera, Alex Vera, and Tony Simons. Garcia was read his constitutional rights per *Miranda*, stated he understood those rights, and agreed to speak with the Agents. Garcia stated that he was in debt. He said that he went to Tijuana, Mexico on the day before his arrest. He met up with Ortis there. He claimed Ortis only was an acquaintance and that he knew her because he previously was in a relationship with her daughter. He said that he stayed in Ortis' house in Tijuana. On the date of their arrest, they came north through the San Ysidro, California port of entry in the same car. They went to pick up Ortis' vehicle in Chula Vista. They separated for approximately three hours. Garcia then received a call from Ortis who told him that she wanted to take something north and wanted him to accompany her. Garcia said that he had his suspicions that it was something illegal but he did not ask questions. Garcia stated that Ortis told him to drive north on S2 near Ocotillo, California. He said that Ortis called him to ask if he had seen a checkpoint while driving up S2 and if anyone

was there. Garcia told her that no one was at the checkpoint. Garcia said that he continued to drive north until Ortis eventually caught up with him and began following him. He said that they were headed north to Los Angeles, California but that he was not sure where Ortis was going.

23.  Garcia then said that what he was stating before was partially false. Garcia admitted that he was guiding and scouting for Ortis. He claimed that he knew she had something illegal in her car. He said that, even though he did not ask Ortis, he assumed that she was smuggling illegal aliens. Garcia said that he knew he was going to guide and scout on S2 after Ortis already picked up the illegal aliens and when they were near the Golden Acorn Casino. He said that they did not discuss what he would get paid but that Ortis promised to pay him for being a guide.

24.  On August 28, 2019, a grand jury returned a four-count Indictment, charging Ortis and Garcia with Conspiracy to Transport Certain Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(I), and Transportation of Certain Aliens and Aiding and Abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). Both defendants have pled not guilty.

**Raudel Aguillares-Delgado**

25.  Aguillares was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He admitted that he previously was ordered deported and was removed. Aguillares said that he was from Tepic, Nayarit, Mexico. He said that he left Tepic approximately two weeks ago with the intention to cross illegally into the U.S. He said that, once he arrived in Mexicali, he met an unknown male in the street. He said that this man asked him if he needed help to cross into the U.S. Aguillares said that this man was going to charge him 5,000 Mexican pesos to use one of his "clavos." Aguillares said that he was instructed to hide in the cargo area of a semi-truck parked in the checkpoint in Mexicali. Aguillares said that he then was arrested at the Calexico, California port of entry. He then was sent back to Mexico the following day.

26. Aguillares said that he was thinking of going back to Tepic but decided to go to Tecate. There, he stayed with some family members. While in Tecate, he found another unknown smuggler who was going to charge him $7,000 U.S. dollars on arriving to Los Angeles, California. He said that he met the smuggler by the park and the bus station. He said that he was told to go back to his family and to wait for further instructions.

27. Aguillares said that, on July 31, 2019, he was picked up from his family's house by an older male subject driving a red small sedan. He was taken to an unknown ranch in which he met the two other subjects who were with him at the time of his arrest. Aguillares said an unknown foot guide came and told them to follow him. He said that they all walked for approximately four hours until they reached the border fence. Aguillares said that they climbed over the fence except for the foot guide. Aguillaries said the foot guide instructed them to walk until they arrived at a ranch. Agullares said that they were instructed that there was a car that would pick them up at the ranch. Aguillares said that, once they arrived at the ranch, a white or gray car driven by a female came and picked them up. Aguillares said that he got into the back seat of the car and then they later were pulled over by Border Patrol. When shown six-pack line-ups that including Ortis and Garcia, he was unable to identify anyone.

**Ramiro Gonzalez-Madrigal:**

28. Gonzalez was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He stated that he has been arrested by Border Patrol multiple times with his last arrest in 2008. He said that, on June 7, 2019, he left his hometown in Michoacan, Mexico. He said that he was a police officer and that he feared for his life because the Guadalajara cartel was after him. He said that he hired a man to get him to the next town undetected. He said that he then stayed at a friend's house for several days. He then left for Morelia, where he also stayed for several days. On July 17, 2019, he left for Tijuana. He then stayed with his sister-in-law there. He said that, approximately ten days ago, he went to apply for entry at the San Ysidro, California port of entry. He said that, after applying, he could not

wait any longer and so he contacted a person to smuggle him into the U.S. He said that, on Friday, July 26, 2019, he and some other individuals walked many hours during the night. He said that they jumped the international border wall and were guided by a coyote. He said that, after a few hours of walking through the mountains, they reached a small paved road. He said that a big van pulled up and picked them up to transport them to a small town. Gonzalez said a driver dropped them off in a small trailer. He said that the others in the group were taken by the smugglers and he was left alone. He said that he decided to look for work.

29. Gonzalez claimed that, around 9 a.m. today, a gray car arrived just as he happened to be walking. Gonzalez said a female was driving the car. Gonzalez said that the female asked him if he wanted to work and he replied, "yes." Gonzalez said that the woman told him the job would entail cutting grass in Ocotillo. Gonzalez described the woman as being overweight, but he could not provide any other details. He said the female driver had three other passengers with her along with an acquaintance -- Villa - from his hometown. Gonzalez said that the female drove for about 20 minutes until Border Patrol arrested them. Gonzalez said that he was going to pay $7,000 to be smuggled into the U.S. and that his final destination was Los Angeles, California. When showed a photographic line-up, he identified Ortis as the driver of the car. He was unable to identify anyone from another photographic line-up that included Garcia-Sanchez.

**Brigido Villa-Mota:**

30. Villa was interviewed as a material witness. He admitted to being a citizen and national of Mexico without legal documents to enter or remain in the United States. He said that he left him home in Michoacan around June 25, 2019 and traveled by bus to Morelia, Mexico. He said that he stayed and worked in Morelia for approximately two weeks. He said that he left Morelia around July 16, 2019 and then traveled by bus to Tijuana, Mexico. He said that he arrived in Tijuana around July 19, 2019. While in Tijuana, his intention was to enter the U.S. legally. But, he talked to a friend with the same intention. He was told it would take months to get an appointment. So, he decided to try

12

and cross into the U.S. illegally. Villa said that he then stayed with a friend for about two weeks in Tijuana. He said that his friend Javier got him in touch with an unknown smuggler.

31. Villa said that, on Sunday, July 28, 2019, a smuggler called him. The smuggler let him know when he was going to cross. Villa stated that he along with four other individuals were picked up at an Oxxo gas station. They were driven for approximately two to three hours to a house. Villa said that he was at the house for a short period of time and then he was driven to the border. He said that he jumped the border fence in the early morning hours of July 29, 2019. He said that the four other individuals along with a foot guide were with him. Villa said that they walked for a day and a half through desert and brush to get to the highway. Villa told them to wait at the highway. Villa stated that they waited for approximately 40 minutes. He said that a man driving an SUV stopped and picked them up and then dropped him off in Ocotillo.

32. Villa said that the driver of the car he was arrested in had stopped and asked him if he wanted to work in Los Angeles. He said he agreed to do so but then was arrested by Border Patrol. When shown six-pack line-ups that including Ortis and Garcia, he was unable to identify anyone.

**Pertinent Information on the Target Phones and Devices**

33. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that **Target Phones 1 through 4** were used to coordinate between the human smugglers as well as the smuggled aliens with human smugglers and/or their go-betweens regarding the conspiracy to transportation of aliens, and for aiding and abetting of illegal entries. Ortis stated that both she and Garcia communicated via their phones – **Target Phones 1 and 4** – during the smuggling event. All three material witnesses had their phones on them and thus would have utilized these phones as part of their journey from Mexico into the United States – particularly given that they had to coordinate with family members, friends and smugglers. As indicated above,

Villa stated that a smuggler called him. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular phones and SIM cards may identify other persons – i.e., human smugglers -- involved in alien smuggling activities. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the smuggling activities of Ortis, Garcia, the material witnesses and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Phones 1 through 4** described herein.

## METHODOLOGY

34. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so

14

acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

35. Following the issuance of these warrants, I will collect **Target Phones 1 through 4** and subject them to analysis. All forensic analysis of the data contained within the telephones, and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

36. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

37. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude **Target Phones 1 through 4** were used to facilitate the criminal offenses identified herein by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of crimes and property used in the commissions of crimes of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) – Conspiracy to Transport Aliens in the United States; and, Title 8, United States Code, Section § 1325(a)(1) and Title 18, United States Code, Section 2 -- Improper Entry and Aiding and Abetting. I also believe that probable cause exists to believe that evidence, fruits and instrumentalities of illegal activity committed by Ortis, Garcia, the material witnesses and their co-conspirators continues to exist on **Target Phones 1 through 4** as described in Attachments A-1 through A-4 because the phones have been stored in a secure location. Therefore, I respectfully request that the Court issue these warrants.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Miguel Flores
Border Patrol Agent
U.S. Border Patrol

Subscribed and sworn to before me this 26th day of September, 2019.

_____
The Honorable Ruth Bermudez Montenegro
United States Magistrate Judge

16